COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



PHYLLIS WOODALL,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 


No. 08-07-00015-CR



Appeal from the


171st District Court


of El Paso County, Texas


(TC#20040D01264)


O P I N I O N


 Phyllis Woodall was indicted for one count of aggravated promotion of prostitution (Count
1) and four counts of engaging in organized criminal activity (Counts II-V). A jury found her guilty
of engaging in organized criminal activity as specified in Count II of the indictment. She was
sentenced to sixteen years' confinement and fined $10,000. For the reasons that follow, we reverse
and remand for a new punishment hearing.STATEMENT OF FACTS

 Appellant and her business partner, Jeannie Coutta, owned and operated the Naked Harem, 
each having 50 percent ownership of the club. The Naked Harem was an adult entertainment
establishment without a liquor license. Patrons brought their own alcoholic beverages and paid a
cover charge to watch completely nude female dancers. For a $1 tip to the dancer per song, patrons
could sit by one of the stages and watch. For $10 to $20 per song, a patron could purchase a table
dance, in which the dancer was closer to and more intimate with the customer. For $130 in cash or
a $140 credit card charge, a patron could purchase a private dance - lasting two songs - in one of
the four private rooms. If the patron wanted more private time, he could purchase additional songs. 
The fee was not contingent upon sexual contact occurring.

 The dancers were not employees and were not paid a salary. They were independent
contractors who paid the club $10 per day to perform. The dancers kept the money earned from their
stage and table dances, but they were required to split with the club the money charged for the
private dances. The dancers kept $40 per song and the club kept the balance. Any tips the dancers
received while performing in the private rooms were strictly theirs.

 Appellant and Coutta had total control over club operations. They were rarely on the
premises, although Appellant had closed-circuit television cameras placed throughout the club -
except for the private rooms - and she would monitor the dancers from her house. Her managers
and dancers alerted her to problems or rumors of wrongdoing. If Appellant learned a dancer was
committing acts of prostitution, the dancer was supposed to be fired.

 In addition to Appellant and Coutta, the other individuals named in the indictment as part of
the combination were club managers Sandra Zepeda, Jacob Crum, Maria Brooks, and Richard
Hamm. The managers were not paid a salary but received a commission based on a percentage of 
club revenue. Generally speaking, the club generated 50 percent to 75 percent of its revenue from
the private dances. In fact, it could not have survived otherwise.

Testimony of the Employees


 Appellant and Coutta did not like the dancers to only offer table dances, as that was seen as
selfish and it did not make money for the club. Thus, the managers were told to encourage the
dancers to sell private dances. The "official" policy was that no sexual contact was allowed
anywhere in the club, including the private rooms. There was a sign posted at the entrance stating,
"Sex is not permitted or offered in this club at all - From management." But according to Jacob
Crum, Appellant encouraged the dancers to engage in sexual acts with the patrons.

 Crum was an employee of the club for seven years. He was aware of the sexual activity and
prostitution occurring in the private rooms and estimated that ten or twenty dancers were engaging
in sexual contact. Crum often had a choice of dancers to send to "high-rollers," and he would send
the dancers he knew or suspected were willing to perform sexual acts. According to Crum,
Appellant knew about the prostitution. He overheard Appellant tell one of the dancers that she could
make a lot of money by engaging in oral sex. Appellant was also heard to comment that "the dancers
shouldn't be having sex in the privates, but it was difficult or hard to control what they did back
there."

 Richard Hamm worked at the club for nine years in various positions including as a manager. 
Appellant constantly told the managers that "whatever goes on in the private is private." Hamm
knew that there was prostitution occurring. Crum and Zepeda also knew, but Brooks ignored it. 
Zepeda's daughter Precious danced at the club and Zepeda admitted that her daughter was a
prostitute. Hamm also explained that local Planned Parenthood representatives would come by the
club and leave a supply of condoms and dental dams. It also provided information regarding
sexually transmitted diseases. Appellant knew there were condoms available at the club.

 Joel Rodriguez is another former manager. When he was hired, Appellant told him that sex
was against the rules and that he was to fire any dancer caught having sex in the private room or
talking about it. Yet when Rodriguez actually fired two dancers for talking about having sex in the
private rooms, Appellant re-hired them. She told Rodriguez it was none of his business and that he
should not interfere with the dancers.

Testimony of the Customers


 Several former patrons testified and admitted engaging in sexual activity. Matthew Michael
Lopilato said dancers offering private dances approached him. When he asked what would occur
in the private rooms, he was told that he could do anything he wanted. On several occasions, he
engaged in sexual activities with dancers in the private rooms. Michael A. Soto testified that when
he asked what happened in the private rooms, a dancer responded "pretty much anything" and told
him that they could have sex. He and a dancer had oral and "regular" sex. David Andrade had been
a customer for twenty years. He had sex with a dancer known as Brandy on thirty different
occasions. He also had sexual relations with fifteen other dancers at the club. David Montalvo was
also a twenty-year customer. He had sex with the dancers in the private rooms on several occasions. 
According to Montalvo, not all the dancers were willing to have sex, but all you had to do was ask.

 Anthony Martinez began going to the club in 1996. He had sex with Zepeda's daughter,
Precious, in one of the private rooms. Pedro Cintron had sex in the club on various occasions and
in one instance spent in excess of $10,000 in a single night. Other patrons testified in similar
fashion.

Testimony of the Dancers


 The jury also heard from some of the dancers. Veronica de Luna had a few regular customers
with whom she had sex in the private rooms. Mari Lee Snider danced for six months and had sex
with a customer on one occasion. Snider recounted that Appellant told the dancers not to touch the
condoms and that the customers should put them on. The condoms were not to be thrown in the
trash.

 Tara Pannell testified that she too had sexual contact with the customers in the private rooms. 
Although management encouraged dancers to do private dances, they were never told what to do
once they were in the private rooms. Pannell said that Appellant had nothing to do with her
committing acts of prostitution, but that Appellant knew prostitution was occurring.

 Molly Crum also worked as a dancer. In spite of the no sexual-contact rule and despite the
fact that her husband worked at the club, Crum had sex in the private rooms. She testified that
Appellant knew about the distribution of condoms and instructed dancers not to leave condoms in
the private rooms. Other dancers admitted to engaging in sexual contact with the customers. Most
said that there was no extra charge for the sex, but a few admitted that they charged the patron extra. 
Still others testified that they did not have sexual contact with the customers.

Physical Evidence


 Other evidence of physical signs of prostitution was presented to the jury. Richard Hamm
observed dancers emerging from private rooms with "fluids coming out between their legs, or on
their breasts, or around their lips" which could be seen under the black lights. The cameras also
showed that dancers would rush out of the private rooms to the bathroom or dressing room area to
clean themselves with baby wipes and brush their teeth. Illegal sexual activity was also occurring
on the club floor. Some dancers would allow the patrons to touch them on their breasts or genitals
during the lap dances. Former patrons also described how a dancer would rub her nude breasts
against them and/or allow them to touch her breast and buttocks during a table dance.

 The club developed a problem with used condoms left in the private rooms. Appellant met
with club employees and dancers and announced she would fine the dancers $50 for condoms left
in the room. They were instructed to flush the condoms down the toilet. A special trap had to be
installed in the sewer line to catch the condoms and baby wipes. Appellant acknowledged she had
a plumber install the trap.GRAND JURY TESTIMONY

 We begin with Issues Seven and Eight. Issue Seven complains that grand jury testimony was
erroneously admitted under the past recollection recorded hearsay exception. Issue Eight challenges
the admissibility of grand jury testimony in violation of the Confrontation Clause.

 Lucia Pinedo, a former dancer at Naked Harem, provided grand jury testimony relating to her
activities there. Appellant called Pinedo as a witness at trial. She testified that she had been in a
serious automobile accident a year earlier, when she was 18, and suffered memory loss as a result. 
She was not able to remember speaking to the grand jury, nor could she recall working at Naked
Harem.

 After Pinedo's first day of testimony, the prosecutor asked that she be kept under subpoena
for possible re-call. After Appellant rested, the prosecutor tried to re-call Pinedo as a witness. She
was not present. At that point, the prosecutor proposed reading Pinedo's grand jury testimony to the
jury as a past recollection recorded under Tex.R.Evid. 803(5). The defense objected on two
grounds. First, counsel argued that the State had failed to establish a proper predicate, and second,
counsel argued that he would not be able to cross-examine Pinedo about the grand jury testimony,
thus violating Appellant's right of confrontation. The trial court offered to issue a writ of
attachment, but the defense claimed it would be futile since Pinedo had already testified she had no
memory of her statements to the grand jury. In the end, the defense rejected the writ of attachment
and the trial court overruled its objections.

 The State read to the jury the fifty-seven pages of Pinedo's grand jury testimony, including
her written statement to the police. At that time, Pinedo was 15 years old and had been a dancer at
the Naked Harem for about a month. She had used her high school picture I.D. when seeking a
position as a dancer. She was told that the policy of the club was that no sex or touching was
permitted in the private rooms with customers. She went into private rooms with customers three
or four times during each of her eight-hour shifts. She had sexual contact with customers on
numerous occasions, and engaged in oral sex a few times per week. She admitted to six occasions
of sexual intercourse and she explained that on her first night at work, she made $900. Pinedo was
granted immunity from prosecution for her testimony.

Confrontation Clause

 In all state and federal criminal prosecutions, the accused has a right, guaranteed by the Sixth

 and Fourteenth Amendments to the United States Constitution, "to be confronted with the witnesses
against him." U.S. Const. amends. VI, XIV; Crawford v. Washington, 541 U.S. 36, 42, 124 S.Ct.
1354, 1359, 158 L.Ed.2d 177 (2004); Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13
L.Ed.2d 923 (1965) (applying the Sixth Amendment to the states). To implicate the Confrontation
Clause, an out-of-court statement must be (1) made by an absent witness and (2) testimonial in
nature. Crawford, 541 U.S. at 50-52. Once the Confrontation Clause is implicated, testimonial
hearsay is inadmissible unless (1) the declarant is shown to be unavailable to testify and (2) the
defendant had a prior opportunity to cross-examine the declarant. Id. at 53-54. Although we defer
to a trial court's determination of historical facts and credibility, we review a constitutional legal
ruling de novo. Wall v. State, 184 S.W.3d 730, 742 (Tex.Crim.App. 2006).

 Post-Crawford, the threshold question in any Confrontation Clause analysis is whether the
statements at issue are testimonial or non-testimonial in nature. Wilson v. State, 151 S.W.3d 694,
697 (Tex.App.--Fort Worth 2004, pet. ref'd); see Crawford, 541 U.S. at 68-69. Testimony before
a grand jury and statements derived from police interrogations are indisputably testimonial. See
Crawford, 541 U.S. at 68.

 The State argues the Confrontation Clause was not implicated because Pinedo was not absent
from trial. It is true that Pinedo did appear in court and that she was questioned by defense counsel,
but she testified to a complete memory loss concerning her grand jury testimony. Tex.R.Evid.
804(a)(3) (witness who testifies to lack of memory of subject matter of declarant's statement is
unavailable as witness). "Absence" in the sense of implicating the Confrontation Clause does not
always mean physical absence (although we note that Pinedo was physically absent when her
testimonial statements were read). Morrison v. State, No. 02-05-00443-CR, 2007 WL 614143, at
*3-4 (Tex.App.--Fort Worth 2007, pet. ref'd) (not designated for publication) (Crawford analysis
performed where declarant was actually present at trial for examination, but would not testify to the
elements of the offense and out-of-court statements were used to supply testimony declarant was
unwilling and unable to give). See Del Carmen Hernandez v. State, 219 S.W.3d 6 (Tex.App.--San
Antonio 2006), aff'd, 273 S.W.3d 685 (Tex.Crim.App. 2008) (witness was not available to testify
and the Confrontation Clause was implicated regarding out-of-court statements used where witness
invoked Fifth Amendment right not to testify); Laredo v. State, 194 S.W.3d 637 (Tex.App.--Houston
[14th Dist.] 2006, pet. ref'd) (where child actually testified but refused to answer any questions about
alleged offense, either simply not responding to questions, stating she did not remember what
happened, or stating she did not want to talk about it, child was found not available to testify under
Tex.Code Crim.Proc.Ann. art. 38.071, § 3 and admission of child's out-of-court statements
implicated the Confrontation Clause). We conclude the Confrontation Clause was implicated here
because the State used out-of-court testimonial statements about which the declarant could not be
cross-examined due to memory loss.

 The State next argues that Pinedo's absence could have been remedied by the issuance of a
writ of attachment. The trial court offered to issue the writ, but Appellant expressly rejected the
offer because it would be futile. Pinedo had already testified she had suffered a complete memory
loss over the relevant subject matter. She did not remember giving the grand jury statement, nor
could she remember working at the Naked Harem. A writ of attachment would not have changed
Pinedo from an "absent" witness into a witness "available for trial and examination." Her
undisputed testimony about the car accident and resulting memory loss established that she was
unavailable as a witness regarding the relevant subject matter. Once Pinedo's unavailability was
established, she remained unavailable at least so long as her memory was not restored.

 Pinedo's memory loss satisfies the first prong of Crawford. As for the second prong,
Appellant never had - and would not have had - an opportunity to cross-examine Pinedo regarding
her grand jury testimony. Regardless of whether Pinedo was returned to court, she could not have
been questioned about her prior testimonial statements. We thus conclude that admission of the
grand jury testimony was constitutional error.

Harm Analysis

 Crawford error is constitutional error subject to a harm analysis under Tex.R.App.P. 44.2(a). 
McNac v. State, 215 S.W.3d 420, 421 (Tex.Crim.App. 2007). We must reverse Appellant's
conviction unless we find beyond a reasonable doubt that the error did not contribute to conviction
or punishment. Wall, 184 S.W.3d at 745-46. The Court of Criminal Appeals has established four
factors we should consider in analyzing harm from Crawford error: (1) the importance of the
hearsay statements to the State's case; (2) whether the hearsay evidence was cumulative of other
evidence; (3) the presence or absence of evidence corroborating or contradicting the hearsay
testimony on material points; (4) the overall strength of the State's case. Davis v. State, 203 S.W.3d
845, 852 (Tex.Crim.App. 2006), cert. denied, 549 U.S. 1344, 127 S.Ct. 2037 (2007). We must be
convinced beyond a reasonable doubt that the error probably did not have a significant impact on the
mind of the average juror. Id. We apply a harm analysis to both the guilt/innocence stage and the
punishment stage of trial. See Wall, 184 S.W.3d at 746-47.

 We conclude beyond a reasonable doubt that the grand jury testimony did not contribute to 
the conviction. We agree with the State that Pinedo's grand jury testimony was cumulative of the
many former dancers who testified to the same end. We are satisfied that the evidence was legally
sufficient to support a conviction even without Pinedo's testimony, as the evidence of guilt was 
overwhelming. But the same cannot be said of the punishment phase. We agree with Appellant that
the details of alleged acts of child prostitution contained in the fifty-seven page grand jury testimony
were explosive and likely had a significant impact on the minds of the jurors. No other child witness
testified at trial, and the State sought a harsher punishment because the Appellant never apologized
for allowing child prostitution to occur. We highlight here portions of the State's closing argument:

 Same thing with the under-age dancer. You saw that little girl when she came in and
testified. You know what she looked like. And this is three years after she was hired
by the defendant to work in her club. The extent of her responsibility, as you can
judge from the evidence, "Oh, well, I asked her what her age was. She said she was
18, so I've got no further responsibility to check and actually find out how hold [sic]
she is." I mean, she looks like she's 12. But, "Oh, well, I asked her and she showed
me a high school ID" - that had no date of birth or anything else on it. But, "I've got
no further responsibility to find out whether she actually was of legal age to work in
my club. I didn't have to ask her for her driver's license. I didn't have to ask her for
her birth certificate. I was just going to take her word for it." Even though any
reasonable person is going to say, "Hey, girl, you're way underage. There's no way
you're going to work in my club."


 But she hires her to work in here [sic] club. Within days she's engaging in
prostitution activity in that club. Why? It's a fresh dancer. It's a new face. It makes
more money for her and makes more money for her manager to exploit her.


Appellant was eligible for probation. She was sentenced to sixteen years' imprisonment. We
conclude that the trial court erred by allowing Pinedo's out-of-court statements to be read to the jury
in violation of Appellant's rights under the Sixth and Fourteenth Amendments, and that the error
caused harm in the punishment stage of the trial. We sustain Issue Eight. Because we have found
the grand jury testimony was erroneously admitted in violation of the Confrontation Clause, we need
not address Appellant's argument in Issue Seven that it was improperly admitted pursuant to a
hearsay exception.

 Our resolution of the grand jury testimony requires a remand only for purposes of
punishment. Because Appellant raises other issues relating to error at the guilt/innocence phase, we
must address them in full.

 COUNSEL OF CHOICE


 Michael Gibson represented Appellant at trial. Sandra Zepeda, named along with Appellant
in the indictment, was represented by Charles Roberts. Appellant informed the trial court that she
wanted Roberts to conduct voir dire because of his expertise in jury selection. The prosecutor
objected because he intended to subpoena Zepeda and conflicts of interest would exist. The
prosecutor also advised that Zepeda would receive immunity for her testimony in Appellant's case. 
Both Appellant and Zepeda signed waivers of any conflict of interest. Gibson intended to resume
his role as lead counsel after the jury was empaneled. The trial court would not allow Roberts to
conduct the voir dire. Nevertheless, he assisted Gibson during voir dire by taking notes and offering
his opinion as to which members of the venire panel should be stricken.

 Appellant now complains that her Sixth Amendment right to the counsel of her choice has
been violated. The Sixth Amendment has been interpreted to guarantee a criminal defendant his
choice of counsel as long as the attorney is qualified and the defendant can afford her choice or
counsel will represent the defendant regardless of the defendant's ability to pay. United States v.
Gonzalez-Lopez, 548 U.S. 140, 144, 126 S.Ct. 2557, 2561, 165 L.Ed.2d 409 (2006); Caplin &
Drysdale, Chartered v. United States, 491 U.S. 617, 624-25, 109 S.Ct. 2646, 105 L.Ed.2d 528
(1989). This right is not absolute and "is circumscribed in several important respects." Wheat v.
United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). When dealing
with conflicts of interest, a trial court may refuse to allow the representation by an attorney in
conflict and the judge is given wide latitude in denying a waiver of conflict by the parties. Wheat, 
486 U.S. at 163, 108 S.Ct. at 1699. So, "while there is a strong presumption in favor of a
defendant's right to retain counsel of choice, this presumption may be overridden by other important
considerations relating to the integrity of the judicial process and the fair and orderly administration
of justice." Gonzalez v. State, 117 S.W.3d 831, 837 (Tex.Crim.App. 2003) (citing Wheat, 486 U.S.
at 158-60). If the trial court acts unreasonably or arbitrarily in denying a defendant's right to choose
counsel, it rises to the level of a constitutional violation. Id. And as we now know, an erroneous
deprivation of a defendant's right to choose the counsel of her choice qualifies as structural error
which is not subject to harm analysis because it is impossible to quantify the type of harm or its
impact on the overall case. Gonzalez-Lopez, 548 U.S. at 141, 126 S.Ct. at 2559.

 We have reviewed the record to determine if the trial court was justified in finding that a
conflict of interest did exist, or that a showing for a potential conflict was made. Zepeda was a co-defendant who would be subpoenaed to testify against Appellant. She would also receive immunity
for her testimony. The trial court has an independent duty to ensure that a fair and legitimate trial
is conducted and in seeing that its judgments remain intact on appeal. Wheat, 486 U.S. at 161-62,
108 S.Ct. at 1697-98. The record contains evidence that a conflict of interest was present. The trial
court is given latitude in refusing to accept a waiver to ensure that a fair trial is conducted. Id. at
162-63. We overrule Issue One.

VOIR DIRE

 In her second and third issues, Appellant complains she was denied the right to ask questions
regarding the presumption of innocence and questions regarding bias and prejudice. Article I, § 10,
of the Texas Constitution guarantees the right to counsel. This includes the right of counsel to
question members of the venire panel in order to intelligently exercise peremptory challenges. 
Howard v. State, 941 S.W.2d 102, 108 (Tex.Crim.App. 1996); Ex parte McKay, 819 S.W.2d 478,
482 (Tex.Crim.App. 1990); Shipley v. State, 790 S.W.2d 604, 607-08 (Tex.Crim.App. 1990). When
an appellant challenges a trial judge's limitation on the voir dire process, the reviewing court must
analyze the claim under an abuse of discretion standard, the focus of which is whether the appellant
proffered a proper question concerning a proper area of inquiry. Howard, 941 S.W.2d at108;
Caldwell v. State, 818 S.W.2d 790, 793 (Tex.Crim.App. 1991), cert. denied, 503 U.S. 990, 112 S.Ct.
1684 (1992), overruled on other grounds by Castillo v. State, 913 S.W.2d 529 (Tex.Crim.App.
1995); Cockrum v. State, 758 S.W.2d 577, 584 (Tex.Crim.App. 1988), cert. denied, 489 U.S. 1072,
109 S.Ct. 1358 (1989). A proper question is one which seeks to discover a venire member's views
on an issue applicable to the case. Howard, 941 S.W.2d at108; Caldwell, 818 S.W.2d at 794;
Guerra v. State, 771 S.W.2d 453, 468 (Tex.Crim.App. 1988). If a proper question is disallowed,
harm to the appellant is presumed because she has been denied the ability to intelligently exercise
her peremptory strikes. Howard, 941 S.W.2d at108; Caldwell, 818 S.W.2d at 793. However, a trial
court is given broad discretionary authority to impose reasonable restrictions on the voir dire process. 
Howard, 941 S.W.2d at108; Caldwell, 818 S.W.2d at 794. In particular, a trial court may restrict
confusing or misleading voir dire questions. See Jones v. State, 850 S.W.2d 223 (Tex.App.--Fort
Worth 1993, pet. ref'd). Where the trial court places no absolute limitation on the underlying
substance of a voir dire question, it is incumbent upon defense counsel to rephrase an improperly
phrased query or else waive the voir dire restriction. Howard, 941 S.W.2d at 108-11.

Presumption of Innocence 
 Before the commencement of voir dire, defense counsel asked the trial court if he could
pursue questions based on his definition of the presumption of innocence. He argued that the
presumption of innocence requires jury members to maintain that presumption until they begin
deliberations. The trial court replied that the presumption of innocence applies only until the
beginning of trial. During voir dire the prosecutor explained that the State caries the burden of
proving all elements of the crime beyond a reasonable doubt. Defense counsel also explained the
different burdens of proof, reiterating that all allegations had to be proven beyond a reasonable
doubt.

 We agree with Appellant that the presumption of innocence continues throughout the trial
and until the jury reaches a verdict based on the facts presented at trial. Miles v. State, 204 S.W.3d
822, 824 (Tex.Crim.App. 2006); McGrew v. State, 140 Tex.Crim. 77, 78, 143 S.W.2d 946, 946-47
(1940); Massey v. State, 154 Tex.Crim. 263, 226 S.W.2d 856, 860 (1950). This does not mean,
however, that a juror is not continuously weighing the strength of the evidence and making
inferences during the presentation of both sides' cases. In practice, the presumption of innocence
is merely an assignment of a burden of proof, and it serves as a constant reminder that the jury is to
consider nothing but the evidence in determining guilt or innocence. Madrid v. State, 595 S.W.2d
106, 110 (Tex.Crim.App. 1979); Rideau v. State, 751 S.W.2d 248, 250 (Tex.App.--Beaumont 1988,
no pet.). The trial court may prohibit questions that could be misleading. The court could have
reasonably concluded that the jury might think they were not permitted to form any opinions
whatsoever during the course of the trial. In no way did the court prevent defense counsel from
asking other questions about the presumption of innocence. We overrule Issue Two.

Jurors' Neighborhoods


 During voir dire, defense counsel asked whether any venire member had religious issues with
adult entertainment establishments or whether they would object to a strip club operating in their
own neighborhood. The State objected on relevancy grounds. Defense counsel replied that he
wanted to know if a juror "would go absolutely bonkers if they tried to put an adult club up against
- up in my block." The following exchange then occurred:

 COURT: What does this have to do with this case in being fair and impartial in
trying this case?


 DEFENSE: What is has to do with is because they have a bias or prejudice- 


 COURT: No, sir. No, sir.


 DEFENSE: - against an adult club.


 COURT: No, sir, that's not it. Ask them that question: "Do they have a bias
and a prejudice?"


. . .

 COURT: Can they be fair. And you're not getting there. And you're inviting,
again, remarks that are going to be highly moot, highly emotional,
highly charged, and I'm not going to allow it anymore. Because
that's what is going to happen. I think you're inviting errors is what
you're doing, with your conduct and your questions. And you know
that. You know that.


 DEFENSE: All right, let me get this clear. The Court is not going to allow me to
examine the individual voir dire persons on the venire by asking them
- other than saying, "Do you have a bias against adult clubs," other
than asking that question? I can't ask them any other questions about
that? About how they feel about it or whether they would like to have
one next door to them? Or why they think they're bad?


 COURT: How they feel about it is one thing - 


 DEFENSE: That's what I asked them. 

 

 COURT: No. You're asking them whether or not they want - they would be
happy about having a - this kind of club next to their house or in their
neighborhood.


. . .



 DEFENSE: You keep forgetting the purpose of this is to allow me to exercise my
peremptory challenges intelligently. And if a juror says, "I hate these
places, and I don't like them, and I set fire to it or burn them down if
they open up next to me," that allows me to exercise an intelligent
peremptory. Simply saying to somebody, "You got any bias or
prejudice?" "No." That doesn't even get close to it, Judge. 


 COURT: You can ask them that question, but don't ask them how they feel
about having this kind of establishment in their neighborhood . . . .


. . .


 COURT: So however you want to ask those questions, I will allow you. Not in
regards to having an establishment like this where they live. I'm not
going to allow that question.


 DEFENSE: Okay.


 COURT: Go ahead.


 DEFENSE: Well, I can't.

 

 Only one panel member had moral objections to strip clubs. Defense counsel moved for a
mistrial on the grounds that he had been prevented from questioning venire members about moral
and religious objections to strip clubs. At this point the trial court emphasized that the only
prohibited line of questioning was whether the panel members would want an adult entertainment
establishment in their neighborhood.

 Trial courts are given broad discretionary authority to impose reasonable restrictions on the
voir dire process. Howard, 941 S.W.2d at108; Caldwell, 818 S.W.2d at 793. Counsel was permitted
to ask what bias or prejudice panel members had about adult entertainment clubs. Because the trial
court was entirely within its discretion in limiting the defense to relevant questioning, Appellant was
not denied her right to intelligently exercise her peremptory strikes. We overrule Issue Three.

DENIAL OF MISTRIAL

 During voir dire, the prosecutor sought to determine whether any of the prospective jurors
had heard pretrial publicity concerning the Naked Harem. He also asked whether anyone had
personal experience with the club, and, if so, would they be able to base their decision on the
evidence presented at trial. In response to that question, a prospective juror called the Naked Harem
a whorehouse and announced that her husband had been there. The prosecutor tried to quiet the
juror, but she again called the club a whorehouse.

 Defense counsel immediately approached the bench and asked the trial court to instruct the
panel to disregard the outburst. The court complied with this request. Counsel then moved for a
mistrial, which was denied. The trial court instructed the prospective juror to stand and told the
panel to disregard her outburst. The panel was also directed to be quiet and obedient if an attorney
so instructed them. The prosecutor then asked the remaining panel members whether they could
decide the case on the basis of the evidence presented at trial and explained that the outburst was not
evidence. He then polled the panel members row by row on whether they could follow the court's
instruction to disregard the outburst. Only Juror Number 115 could not follow the instruction. 
Neither the outspoken juror nor Juror Number 115 were seated on the jury.

 Appellant argues that the trial court abused its discretion by denying her motion for mistrial. 
She claims the outburst went to the heart of the State's case and was clothed in emotional assertions
of marital infidelity. A mistrial is appropriate for "highly prejudicial and incurable errors." Simpson
v. State, 119 S.W.3d 262, 272 (Tex.Crim.App. 2003). We review the denial of a motion for mistrial
under an abuse of discretion standard. Hawkins v. State, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004).
When reviewing the ruling, we look to: (1) the severity of the misconduct (the magnitude of the
prejudicial effect); (2) the measures adopted to cure the misconduct (the effectiveness of any
cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct. Id. 
"Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." Id.

 We are to presume that the trial court's well-worded instruction cured any prejudicial effect
the comment otherwise would have had. See Wesbrook v. State, 29 S.W.3d 103, 116
(Tex.Crim.App. 2000) (we presume the trial court's instruction to disregard was followed by jurors);
Williams v. State, 937 S.W.2d 479, 490 (Tex.Crim.App. 1996); Waldo v. State, 746 S.W.2d 750-54
(Tex.Crim.App. 1988); see also Wilkerson v. State, 881 S.W.2d 321, 327 (Tex.Crim.App.1994), cert.
denied, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994) (an instruction to disregard will
generally cure the error).

 While the outburst here was prejudicial and harmful, even harmful comments can be cured
by an instruction. Young v. State, 137 S.W.3d 65, 71 (Tex.Crim.App. 2004). Sufficient measures
were taken here to cure the harm. The panel was instructed to disregard the outburst and to listen
to the attorneys. When polled, only one panel member was unable to set aside the outburst and
render a decision solely on the basis of evidence presented at trial. We overrule Issue Four.

ACCOMPLICE WITNESS TESTIMONY


 A conviction may not be had upon the testimony of an accomplice unless that testimony is
corroborated by other non-accomplice evidence that tends to connect the defendant to the crime.
Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon 2005). "An accomplice is someone who participates
with the defendant before, during, or after the commission of a crime and acts with the required
culpable mental state." Druery v. State, 225 S.W.3d 491, 498 (Tex.Crim.App.), cert denied,
___U.S.___, 128 S.Ct. 627 (2007). This participation must include an affirmative act in promotion
of the commission of the offense with which the defendant is charged. Id. at 498.

 To be an accomplice as a matter of law, the participant must be susceptible to prosecution
for the offense with which the defendant is charged or a lesser-included offense. Id. If the individual 
has been charged with the offense or a lesser-included offense, the jury should be instructed that the
witness is an accomplice as a matter of law. Id. An immunity agreement is directly relevant to
determining whether a witness is an accomplice as a matter of law. Jones v. State, 195 S.W.3d 279,
290 n.12 (Tex.App.--Fort Worth 2006), aff'd, 235 S.W.3d 783 (Tex.Crim.App. 2007). If there is
conflicting evidence, the trial court should submit an accomplice-as-matter-of-fact instruction in the
charge. Druery, 225 S.W.3d at 498-99. And as the State points out, there must be some evidence
of an affirmative act by the witness to assist in the commission of the charged offense before such
an instruction is required. Id. at 499.

 When reviewing the sufficiency of corroborating evidence under Texas Code of Criminal
Procedure Article 38.14, we must eliminate from consideration any testimony by an accomplice
witness. Bingham v. State, 913 S.W.2d 208, 210 (Tex.Crim.App. 1995). This does not mean the
non-accomplice evidence has to prove guilt beyond a reasonable doubt, but it must connect the
defendant with the offense. McDuff v. State, 939 S.W.2d 607, 612 (Tex.Crim.App. 1997). All that
is required for corroboration is some non-accomplice evidence tending to connect the defendant with
the offense. Joubert v. State, 235 S.W.3d 729, 731 (Tex.Crim.App. 2007).

 The State and the defense agree that Richard Hamm and Jacob Crum were accomplices as
a matter of law. All of the patrons and dancers were granted transactional immunity, and the State
agrees that these witnesses were susceptible to prosecution for prostitution, which is a lesser-included offense of the charged offense of engaging in aggravated promotion of prostitution. The
State concedes that the patrons and dancers were accomplices as a matter of law, but argues that
Appellant failed to request a jury instruction. As a result, the witnesses' accomplice status was a 
fact question for the jury.

 Appellant testified at trial. She acknowledged that she had total control over the hiring and
firing of all employees, managers, and dancers. She was aware of the problems at the club and kept
an ear to the wall. She had installed cameras throughout the club so that she could monitor activities
from her home. She knew that Planned Parenthood delivered condoms and oral dams to the club. 
She knew that condoms were being left in the private rooms, and she instructed the dancers to clean
up the rooms. She hired a plumber to install a trap in the sewer line because dancers were flushing
baby wipes down the toilet. A photograph of the trap was admitted into evidence showing large
amounts of used condoms. Appellant was aware that inappropriate sexual activity had been
occurring. She even knew that Crum was being paid to have sex with one of the dancers while a
customer watched. Sufficient non-accomplice evidence connects Appellant with aggravated
promotion of prostitution.

 The record also contains the non-accomplice testimony of Joel Rodriguez, a former manager. 
Rodriguez testified that Appellant re-hired two dancers he had fired for having sex in the club. 
Appellant told him it was none of his business and that she watched what the girls were doing in the
private rooms. Rodriguez also testified that Appellant and Coutta told the managers what to do and
how to run the club. Sufficient non-accomplice evidence tends to connect Appellant to the charged and predicate
offenses. The non-accomplice evidence must only tend to show that Appellant was involved in the
aggravated promotion of prostitution and a criminal combination. We overrule Issue Five.

ORGANIZED CRIMINAL ACTIVITY

 Having concluded that the Appellant was sufficiently connected to the charged offense, we
turn now to whether the evidence was legally sufficient to support the conviction for organized
criminal activity. A legal sufficiency review is conducted under the Jackson v. Virginia framework. 
443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We review the evidence in the light most
favorable to the verdict and reverse only if no rational trier of fact could have found that the State
discharged its burden of proof beyond a reasonable doubt. Id.

 The State proceeded to trial on Count II of the indictment, which alleged that Appellant "did
then and there with intent to establish, maintain, and participate in a combination and in the profits
of a combination with JEANNIE COUTTA, SANDRA ZEPEDA, JACOB CRUM, MARIA
BROOKS, AND RICHARD HAMM, did then and there commit the criminal offense of
Aggravated Promotion of Prostitution . . . ." A "combination" is defined as "three or more
persons who collaborate in carrying on criminal activities." Tex.Penal Code Ann. § 71.01(a)
(Vernon 2003). The aggravated promotion of prostitution is a predicate offense to a combination. 
Tex.Penal Code Ann. § 71.01(a)(3). The State must prove a two-part mens rea. Hart v. State, 89
S.W.3d 61, 63 (Tex.Crim.App. 2002). First, the State must prove the defendant has the requisite
culpable mental state to commit the predicate offense; and second, the State must prove that the
defendant committed the predicate offense with the intent to establish, maintain, or participate in a
combination or the profits of a combination. Id. The State must also prove that the members of the
combination intended to work together in a continuing course of criminal activity, Dowdle v. State,
11 S.W.3d 233, 236 (Tex.Crim.App. 2000); Barber v. State, 764 S.W.2d 232, 235 (Tex.Crim.App.
1988).

 Under Texas law a person commits prostitution if she engages in sexual conduct for a fee. 
Tex.Penal Code Ann. § 43.02(a)(1) (Vernon 2003). "Sexual conduct" includes oral sex, sexual
intercourse, and "sexual contact," which is defined as any touching of the anus, breast, or any part
of the genitals of another person with intent to arouse or gratify the sexual desire of any person. 
Tex.Penal Code Ann. § 43.01. A person commits the offense of aggravated promotion of
prostitution if she knowingly owns, invests in, finances, controls, supervises, or manages a
prostitution enterprise that uses two or more prostitutes. Tex.Penal Code Ann. § 43.04(a). A
"prostitution enterprise" has been defined in this context as "a plan or design for a venture or
undertaking in which two or more persons offer to, agree to, or engage in sexual conduct in return
for a fee . . . ." Taylor v. State, 548 S.W.2d 723, 723 (Tex.Crim.App. 1977).

 Appellant concedes the evidence reflects she was aware sexual contact occurred between
dancers and customers at the Naked Harem. But she claims that awareness of these unlawful
activities did not prove her intent to engage in the offense of aggravated promotion of prostitution. 
She also argues that no agreement to engage in organized criminal activity among the combination
members was shown.

 A jury is permitted to use circumstantial evidence in arriving at a determination of intent and
knowledge. Munoz v. State, 29 S.W.3d 205, 209 (Tex.App.--Amarillo 2000, no pet.). A jury may
infer from circumstantial evidence (1) the defendant's knowledge of the prostitution activity
occurring in her place of business; (2) the defendant's intent to participate in a combination; and (3)
the agreement of the combination members to work together in carrying out criminal activities. 
Hart, 89 S.W.3d at 63-64.

 Both Crum and Hamm testified that Appellant knew about the prostitution and encouraged
it, at least privately. Dancer Molly Crum testified that Appellant told her that she could allow the
customers to touch her sexually in the private rooms. This type of acquiescence or tacit promotion
is sufficient evidence from which a jury may infer that Appellant was in the business of promoting
prostitution. Armentrout v. State, 645 S.W.2d 298, 299-302 (Tex.Crim.App. 1983); Ringer v. State,
577 S.W.2d 711, 713-16 (Tex.Crim.App. 1979). Viewing the evidence in a light most favorable to
the verdict, it was reasonable for the jury to have found beyond a reasonable doubt that Appellant
was engaged in a combination. We overrule Issue Six.CHARGE ERROR

Accomplice as a Matter of Fact

 Appellant first complains that the trial court erred by not including in the charge an
instruction on accomplices-as-a-matter-of-fact. The record indicates that the accomplice-witness
instruction was included in the charge without objection. Because Appellant acquiesced to the
charge at the formal charge conference, she has waived error. Quattrocchi v. State, 173 S.W.3d 120,
125 (Tex.App.--Fort Worth 2005, pet. ref'd). We overrule Issue Nine.

The Law of Parties 

 The court applied the law of the parties in the application paragraph of the charge as follows:

 Now if you find from the evidenced beyond a reasonable doubt that from on or about
the 10th day of March, 2001 until on or about the 31st day of December, 2003 the
Defendant PHYLLIS WOODALL, did then and there with intent to establish,
maintain, and participate in a combination and in the profits of a combination with
JEANNIE COUTTA, SANDRA ZEPEDA, JACOB CRUM, MARIA BROOKS,
AND RICHARD HAMM, in their individual capacity or as a party, as that term has
heretofore been defined for you, did then and there commit the criminal offense of
Aggravated Promotion of Prostitution, you will find the Defendant PHYLLIS
WOODALL, guilty of Engaging in Organized Criminal Activity as charged in the
Indictment (Verdict Form A).

Appellant claims that this submission dispensed with the need to find collaborative criminal activity 
and thus allowed the jury to convict her without finding that a combination existed (acting together
to commit aggravated promotion of prostitution).

 The offense of aggravated promotion of prostitution and the actual combination are exclusive
inasmuch as the combination members can be found guilty of the target offense if they actually 
committed the target offense or if the defendant committed personally one of the two overt acts
required by Tex.Penal Code Ann. § 71.01(b) (Vernon 2003). McIntosh v. State, 52 S.W.3d 196,
200 (Tex.Crim.App. 2001). A conspirator is punished because of the agreement to commit an
offense with no requirement that the object offense actually be committed. Cf. Woods v. State, 801
S.W.2d 932, 943 (Tex.App.--Austin 1990, pet. ref'd) (explaining that the purpose of prohibiting
conspiracies is to prevent "socially dangerous combinations"). A party is criminally responsible for
the offense committed by another because of the party's own solicitation, encouragement, aid, or
direction. The party is responsible for the conduct of another because of his level of participation
in the offense. Tex.Penal Code Ann. § 7.02 (Vernon 2003). In a conspiracy, the object offense
need not be committed, but the conspirators are still criminally liable for the agreement to commit
the offense. That is why in both contexts party liability will be punished more harshly than liability
as a conspirator; the party is liable for the conduct of the principal. Therefore, no inconsistency
exists in requiring that the accused personally commit an overt act to support conviction of engaging
in organized criminal activity by conspiring to commit the object offense and in using party liability
to support a conviction under the same statute for the commission of the object offense. Because
we find no error in the submission, we overrule Issue Ten.

CONCLUSION


 We affirm the judgment of conviction. We reverse and remand for a new trial on the issue
of punishment.


 ANN CRAWFORD McCLURE, Justice

September 9, 2009


Before McClure, J., Barajas, C.J. (Ret.)., and Hill, C.J. (Ret.)

Barajas, C.J. (Ret.) and Hill, C.J. (Ret.), sitting by assignment


(Do Not Publish)